UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Docket No.   1:15CR10156-1 |
| SCOT B. LETOURNEAU | 1:17CR10355-1 |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Scot Letourneau ("Mr. Letourneau"), by and through undersigned counsel, respectfully submits this memorandum in conjunction with his sentencing scheduled for February 27, 2018. Mr. Letourneau requests this Honorable Court accept the joint sentencing recommendation set forth in paragraph five (5) of the binding plea agreement, pursuant to Fed. R. Crim. P. 11(c)(1)(C), and impose, *inter alia*, 192 months imprisonment for docket number 15-CR-10156, and twelve (12) months imprisonment on docket number 17-CR-10355 to run concurrent with the sentence imposed on docket 15-CR-10156.[1] In short, Mr. Letourneau asserts the jointly recommended sentence is "sufficient, but not greater than necessary" to achieve the purposes of the Sentencing Reform Act.

## BACKGROUND

On November 20, 2017, Mr. Letourneau pleaded guilty to one (1) count of distribution of child pornography, in violation of 18 USC § 2252A(a)(2)(A), and one (1) count of possession of child pornography, in violation of 18 USC § 2252A(a)(5)(B), as alleged in the indictment for

---

[1] The plea agreement, by operation of 18 USC § 2259, also requires a determination of restitution at the time of sentencing and is addressed in greater detail herein.

1

docket number 15-CR-10156. ECF # 16, 113.[2] Mr. Letourneau has a prior conviction which triggers fifteen (15) year and ten (10) year mandatory minimum sentences for the distribution and possession charges, respectively.[3] *See* 18 USC § 2252A(b)(1), (2). He also pleaded guilty on November 20, 2017 to a single-count information (docket number 17-CR-10335) alleging a failure to update sex offender registration, in violation of 18 USC 2250(a).

There is a binding plea agreement in this case, pursuant to Fed. R. Crim. P. 11(c)(1)(C), in which the parties have agreed upon both the calculation of the sentencing guidelines and the recommended sentences for both the indictment and information to which Mr. Letourneau pleaded guilty.[4] ECF # 16. Specifically, the parties jointly recommend this Court impose a 192 months imprisonment for the indicted charges and twelve (12) months imprisonment for the count charged in the information to run concurrently with Count 1 of the indictment, followed by sixty (60) months imprisonment, as well as a $2,000 fine and a $300 mandatory special assessment.

## ARGUMENT

**I.    Applicable Law**

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory. The Sentencing Reform Act requires the Court to consider guidelines ranges,

---

[2] Unless otherwise noted, citations to ECF entries correspond to docket number 15-CR-10156.

[3] The parties and U.S. Probation agree that although this prior conviction triggers the sentencing enhancements in 18 USC § 2252A(b)(2), it falls outside the applicable time period for purposes of scoring Mr. Letourneau's criminal history. *See* USSG § 4A1.2(e).

Mr. Letourneau also respectfully notes the parties mistakenly indicated in the plea agreement the distribution charge carries a possible maximum sentence of life imprisonment. The correct maximum penalty for that charge is forty (40) years imprisonment.

[4] Although the parties agree restitution is to be determined by this Court at the time of sentencing, as is required by statute, *see* 18 USC § 2259, there is not yet agreement as to the amount of restitution.

*see* 18 USC § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care. 18 USC § 3553(a). Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. *Id.*[5]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all of the factors under 18 USC § 3553(a). *Id*. Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 USC § 3553(a); *see also* 18 USC § 3553(a)(1)-(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific

---

[5] Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; her education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12. These factors can now support a sentence outside the guidelines.

3

reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

**II.     Advisory Guidelines Calculation and Applicable Departures**

Pursuant to the binding plea agreement, the parties have calculated Mr. Letourneau's advisory guidelines sentencing range ("GSR") as follows:

**Group 1 – Indicted Charges, Docket Number 15-CR-10156**

Counts 1 and 2 of the indictment are closely related and are therefore grouped under USSG § 3D1.2(d). The base offense level ("BOL") for 18 USC § 2252A(a)(2) is 22. *See* USSG § 2G2.2(a)(2). The following applicable specific offense characteristics result in a further 18-level increase: material involves a prepubescent minor (2 levels); material was distributed with the expectation of receipt of a non-pecuniary thing of value (5 levels); material portrays sadistic or masochistic conduct and/or sexual abuse of an infant or toddler (4 levels); offense involved use of an interactive computer (2 levels); and the offense involved 600 or more images (5 levels). *See* USSG §§ 2G2.2(b)(2), (b)(3)(B), (b)(4), (b)(6), and (b)(7)(D). This results in an adjusted offense level for the first group of 40 (BOL of 22 plus 18 levels of enhancements).

**Group 2 – Single-Count Information, Docket Number 17-CR-10335**

Count 1 of the information, a violation of 18 USC § 2250(a), is a separate group, and carries a BOL of 14 because Mr. Letourneau was required to register as a Tier II offender. *See* USSG § 2A3.5(a)(2). No other enhancements apply.

**Combined Offense Level**

Because the first group of offenses (the indicted charges) is 9 or more levels greater than

the second group (the single count information), the first group does not receive an increase when combined with the second group. *See* USSG § 3D1.4(c). Mr. Letourneau has clearly demonstrated acceptance of responsibility and the government has agreed he provided timely notification of his intent to plead guilty, resulting in a 3-level decrease pursuant to USSG § 3E1.1(a) & (b). His total offense level ("TOL"), as calculated by the parties, is therefore 37.

### Obstruction of Justice

The parties and U.S. Probation have calculated Mr. Letourneau's TOL in the same fashion with one exception: the PSR assigns a 2-level enhancement and a 3-level enhancement for obstruction of justice to the first and second group of offenses, respectively, raising his TOL to 39. The stated basis for the assignment of these points by U.S. Probation is that while Mr. Letourneau was on pretrial release for the indicted charges, he cut off his GPS ankle bracelet and absconded for seventeen (17) months. Mr. Letourneau respectfully objects to the 2-level enhancement to the first group of offenses.

First, the parties' joint recommendation was carefully crafted by the parties and, undersigned counsel respectfully submit, it reflects a fair assessment of the sentencing guidelines and Mr. Letourneau's own culpability.[6] Second, Mr. Letourneau respectfully submits that the circumstances here do not satisfy the standard for an obstruction of justice enhancement under USSG § 3C1.1 in these circumstances. Application Notes 4 and 5 to § 3C1.1 set forth examples of "covered conduct" and "conduct ordinarily not covered," respectively, and which, according to Application Note 3, ought to be used for "comparison" by the Court as an aid to "determining whether application of this adjustment is warranted in a particular case." The most similar example of "covered conduct" at issue here is "escaping or attempting to escape from custody before trial

---

[6] The government has indicated it stands by the binding plea agreement.

or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." Application Note 4(E). And the most analogous example of conduct not ordinarily covered is "avoiding or fleeing from arrest" (which can only be considered as obstructing justice if the defendant acts recklessly during such flight). Here, Mr. Letourneau was not in "custody"[7] and at the time of his flight there had been no date set by the Court at which he failed to appear. As a result, Mr. Letourneau respectfully submits that since no trial, change of plea, or substantive motion hearing date had been set, his flight, although serious and warranting consideration pursuant to USSG § 3553 at the time of sentencing, is more analogous to "flight from arrest" than it is to "flight from custody," and should therefore not result in the application of the enhancement.

**Guidelines Sentencing Range**

The parties have calculated Mr. Letourneau's TOL as 37 and U.S. Probation has calculated it as 39. As for his criminal history, Mr. Letourneau has a single prior conviction which resulted in a committed sentence of less than thirteen (13) months. It may therefore only be counted for purposes of calculating his criminal history score if it was "imposed within ten years of the defendant's commencement of the instant offense conduct." *See* USSG § 4A1.2(e)(2). That sentence was imposed on July 9, 2004 and the indictment charges an offense commencement date of December, 2014, which is outside the applicable time period and therefore goes uncounted. Having no other prior convictions, Mr. Letourneau's criminal history score is 0, with a corresponding Criminal History Category I. A TOL of 37, as calculated by the parties, produces a 210-262 month GSR; whereas, a TOL of 39, as calculated by U.S. Probation, results in a 262-327 month GSR.

**III.    The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Comply**

---

[7] Mr. Letourneau respectfully submits "custody" as used here by the Sentencing Commission means actual, physical custody, not pretrial release.

**With The Statutory Purposes Set Forth In Under the Sentencing Reform Act.**

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiménez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough,* 552 U.S. at 101). That tenet – the "parsimony principle" – instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)).

For the following reasons, and in light of the considerations set forth under section 3553(a), Mr. Letourneau requests this Court accept the binding plea agreement, and impose a sentence of 192 months imprisonment on the indicted charges, 12 months imprisonment for the charge contained in the information to run concurrently with Count 1 of the indictment, and five (5) years of supervised release.

The Offense Conduct section of the PSR fully delineates the criminal conduct for which Mr. Letourneau has accepted complete responsibility. In summary, Mr. Letourneau possessed in electronic and cloud storage format over 500 images and 103 videos of child pornography. He also traded in, and discussed, some of these materials with other individuals using a cell phone messaging application. The victims depicted in these images and videos, indeed all victims of child pornography, have endured great physical and psychological suffering, and will continue to do so for the rest of their lives. While Mr. Letourneau did not create these materials, it is not disputed that his possession and distribution of them perpetuates the subject children's victimization. Moreover, several months after his release on conditions, Mr. Letourneau cut off

his GPS bracelet and fled the jurisdiction for nearly a year and a half until he was located and caught by authorities. Acknowledging this, Mr. Letourneau's now comes humbly before this Court knowing his conduct deserves punishment and is prepared to receive it. "The[] four considerations [of § 3553]—retribution, deterrence, incapacitation, and rehabilitation—are the four purposes of sentencing generally," and the jointly recommended sentence here achieves and balances each of them. *Tapia v. U.S.*, 564 U.S. 319, 325 (2011).

The sentence alone, 192 months imprisonment, is ample and sufficiently retributive for both the conduct which forms the basis for the indictment as well as his post-arrest misconduct. Additionally, the prosecution of Mr. Letourneau itself, as well as the collateral consequences which flow therefrom, are likewise punishing. First, before Mr. Letourneau was released, he was detained in the Plymouth County House of Corrections ("PCHC") which began with a six (6) week stint in solitary confinement. Having been thrust in this type of confinement was emotionally destabilizing, which was exacerbated by a policy that his psychiatric medications had to be crushed before ingestion.[8] Despite being released into protective custody, he also received verbal threats from fellow inmates which returned to his mind his time while incarcerated in New Hampshire.[9] Between these threats and the imbalance created in his mind as a result of the medication he was taking, he began to experience suicidal ideation. At the same time, he learned that his ten (10) year relationship with his domestic partner was coming to an end as a result of these charges, negating an important link in his support network.

---

[8] These medications are damaging both physically and psychologically damaging if their dose is not appropriately balanced given their psychotropic effects. Because they were time-released medications, Mr. Letourneau reports the manner he was required to ingest them had a severely deleterious effect on his psyche.

[9] Mr. Letourneau reports he repeatedly received death threats from one inmate at the jail in New Hampshire. He was ultimately given a night job so he would not be alone while his unit slept.

Although Mr. Letourneau was released from physical custody into home confinement at his sister's residence in Maine, he experienced a different form of imprisonment there. Shortly after arriving, the county sheriff notified him, his sister, and brother-in-law that their long-time neighbor would have to be notified of his sex offender registration. The community in which they lived was small where word spreads fast, and Mr. Letourneau's sister and his brother-in-law had a long-standing relationship with their neighbor which they believed would be severely damaged by revealing his sex offender registration to them. Tensions began to mount with his brother-in-law, in whose home Mr. Letourneau was now residing, and the rest of his tight-knit family in Maine. Inter-familiar conversation contemplated returning Mr. Letourneau to custody despite his adherence to his conditions of release as a means of avoiding local/community opposition to his continued presence. The morning he absconded, Mr. Letourneau was awakened by his father and told that the situation was "too much" for the family. The conversation ended with his father suggesting he return to lock-up at PCHC.[10]

At this time, Mr. Letourneau's mental state was already fractured; he reports he continued to experience significant, daily suicidal ideation even following his release from PCHC. Overwhelmed by the guilt he felt for placing his family in a position which might jeopardize their standing in the small community in which they've lived all their lives, he decided to flee. Mr. Letourneau reports he did so with the intent of finding heroin or fentanyl so he could overdose and in so doing spare his family of having to deal with the difficult situation he caused as well as the pain and embarrassment they would feel during the prosecution of his indictment. Instead of overdosing, he developed an addiction and he reports for approximately a month while he was on

---

[10] It should be noted his family remains steadfastly supportive of him, as is reflected in their letters of support filed herewith.

the run he would smoke it along with marijuana.[11]  Although this by no means excuses Mr. Letourneau's conduct, the guilt and anxiety he was experiencing provides much needed context for his decision to flout an order of the Court.  Indeed, Mr. Letourneau reports his eventual capture was in some sense a relief; his suicidal thoughts only worsened while a fugitive and his mental state is now much improved having received proper psychiatric care at the Donald W. Wyatt Detention Facility, where he is currently detained.

In addition to the foregoing, Mr. Letourneau will and has received additional non-incarcerative forms of punishment as a result of the instant prosecution and guilty plea.  Prior to his arrest, Mr. Letourneau, who has a Bachelor of Science in Environmental Geology from Northeastern University and a Master's Degree in Sustainability and Environmental Management from Harvard, had a successful career as a staff scientist with Environmental Health and Engineering in Needham which afforded him a comfortable lifestyle.  Currently, Mr. Letourneau has little to no assets, no income due to his incarceration, and his conviction and sex offender registration obligations will likely make it impossible to find the same level of employment after his release.  Mr. Letourneau, who is now 46, will be nearly 60 at the time of his release were this Court to impose the recommended sentence.  While repeated studies establish that the risk of recidivism decreases with age, Mr. Letourneau will be totally incapacitated from committing crimes in the long-term future by virtue of the 16 year sentence jointly recommended herein.  He will also experience a form of punishment beyond his incarceration by needing to work well after

---

[11] As set forth in the PSR, Mr. Letourneau reports he was smoking (and self-medicating) with marijuana long before his arrest.  It appears he became addicted to using marijuana daily as a form of coping mechanism and sleep-aid.  *See* PSR ¶¶ 119-120.  In light of U.S. Probation's determination that he appears to qualify for the Bureau of Prison's 500 Hour Residential Drug Abuse Program, Mr. Letourneau respectfully requests this Court make a judicial recommendation he participate in the program.

the typical age of retirement in order to survive. He also respectfully notes his parents, who are both in their mid-80's and whose health is beginning to fail, are almost certain to pass before he is ever released.[12] Mr. Letourneau will therefore serve his sentence with full knowledge that his actions put him in a place where he will be unable to be there for either parent or his siblings in a difficult time, or say goodbye to an important loved one. The requested sentence is not only punishing in some sense, therefore, but will serve the aim of specific deterrence as well.

None of the foregoing is intended to excuse Mr. Letourneau's conduct or suggest the recommended sentence is too harsh; indeed he fully accepts it. Rather, Mr. Letourneau's experiences during his prosecution and the realities of life upon his release help demonstrate the recommended sentence here is sufficient, but not greater than necessary to achieve the various aims of sentencing. The recommended sentence is not only punishing, it is incapacitating given the length of the sentence and Mr. Letourneau's age upon his release, it will afford an opportunity for rehabilitation and treatment, and it will serve as a strong deterrent, not only to Mr. Letourneau lest he lose everything anew, but to anyone else who might decide to engage in similar conduct.

**IV.    Restitution**

According to a report by the National Center for Missing and Exploited Children ("NCMEC"), 28 of the files Mr. Letourneau possessed depict victims whose identities have been previously determined. Undersigned counsel has received from the government notice that counsel on behalf of one these victims (associated with what NCMEC has termed the "8Kids Series") has requests restitution in the amount of $15,000 for the victim. Of the images identified

---

[12] Mr. Letourneau's parents are an integral part of his life (which is part of the reason why the conversation he had with his father on the day he fled was devastating for him) and he has been mindful of their health for some time. Indeed, when Mr. Letourneau's mother was diagnosed with cancer, he immediately moved from California back to Massachusetts in order to be closer to her.

by NCMEC, Mr. Letourneau possessed two (2) from the 8Kids series.

Restitution for the victim in this case is governed by 18 USC § 2259 and its imposition is mandatory if the terms of the statute are satisfied.  The Supreme Court in *Paroline v. U.S.*, 134 S. Ct. 1710 (2014) recently clarified the appropriate standard courts ought to employ when evaluating the amount of restitution to be ordered.  Beginning with the text of § 2259, the Court noted "Congress limited restitution to losses that are the 'proximate result' of the defendant's offense," but construed this language as requiring something less than "but-for causation" to be shown. *Paroline*, 134 S. Ct. at 1728.  The Court then sought to provide guidance in cases where "a defendant possessed a victim's images and a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry." *Id.*  The Court first noted there is no "precise algorithm for determining the proper restitution amount," but that a "starting point" would be to "determine the amount of the victim's losses caused by the continuing traffic in the victim's images… then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id.*  Citing the government's brief, Court then provided the following factors to be considered when determining a defendant's "causal significance" to the victim's losses:

> [T]he number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

*Id.* Finally, the Court noted that in cases of the sort described above "[t]he amount [of restitution] would not be severe in a case like this, given the nature of the causal connection between the conduct of a possessor… and the entirety of the victim's general losses from the trade in her images, which are the product of the acts of thousands of offenders," but nor would the amount of restitution be "nominal." *Id.* at 1727.

The matter before this Court is on all fours with the kind of case considered by the Court in *Paroline*. Just as in *Paroline*, Mr. Letourneau possessed images of the victim, and there is no question this victim will require life-long psychiatric counseling, as amply demonstrated by a psychiatric report in support of his restitution request, some (but not all) of which will be necessary to address the psychological pain associated with the continued trafficking in those images by others. Turning to the factors identified in *Paroline*, Mr. Letourneau was not involved whatsoever with the production of these images; he possessed two (2) images depicting this victim; and there does not appear to be any evidence Mr. Letourneau distributed any of them.[13]

As for the remaining factors, the government has not disclosed information relative to this victim (i.e. how many other criminal defendants have been ordered to pay restitution to him; a sense of how many others may be caught; reasonable estimates of the broader number of offenders involved). Undersigned counsel have been able to locate other cases in which courts have considered requests from the victims depicted in the 8Kids Series. In those cases, restitution was either denied or set at substantially lower amounts than requested here. *See U.S. v. Delacruz*, 12-cr-00132-GEB, ECF # 113 (E.D.C.A. December 18, 2015) (Burrell, S.J.); *U.S. v. Hernandez*, 11-cr-00026-GEB, ECF # 81 (E.D.C.A. July 1, 2014) (Burrell, S.J.); *U.S. v. Hite*, 12-cr-00065-CKK,

---

[13] None of the file names associated with the images which form the basis for the distribution charge correspond to the file names of the images from which NCMEC was able to identify this victim.

ECF # 266 (D.C. June 29, 2015) (Kollar-Kotelly, J.).[14] In *Delacruz*, the court denied the victims' restitution requests, holding the defendant did not distribute their images, and his possession of them did not cause the harm for which they sought restitution. In *Hernandez*, the court also denied the victims' restitution requests because the government failed to show specifically which victim was depicted in the images at issue. Finally, in *Hite*, the victims each sought $25,000 in restitution, but the court ultimately ordered $2,500 per victim.

While the Court in *Paroline* appeared to *suggest* that restitution is mandatory in all cases where a victim can be identified and their losses determined, undersigned counsel believe Senior Judge Burrell's reading of *Paroline* and the text of 18 USC § 2259 (which requires the government to establish the identified victims meet the statutory definition of "victim" for purposes of restitution) in *Delacruz* to be the appropriate statement of the law. However, in an abundance of caution, and in light of the plea agreement in which it is agreed that restitution will be set by this Court at sentencing, undersigned counsel agree restitution is appropriate in this case and do not want (or believe it should) any disagreement with the government over dollar amounts to vitiate/void their sentencing agreement. Still, it is appropriate to point out that the Court in *Hite* determined the defendant, who possessed but did not distribute images of the victims, ought to pay $2,500 per victim. Here, Mr. Letourneau, who is all but indigent as a result of his arrest and incarceration and will have no articulable means of support for the balance of any sentence he receives, possessed substantially fewer images than the defendant in *Hite* (2 in this case; 14 in *Hite*). Additionally, documentation in support of the victim's restitution request indicates that some 800 images of the victims of the 8Kids Series were taken by the individual who originally

---

[14] In a footnote in *Hite*, which was decided 2.5 years ago, the court stated "the government was aware of approximately 132 cases in which the victims of the '8Kids' Series were awarded restitution."

produced them. Accordingly, Mr. Letourneau's possession of two (2) of these images, which do not appear to have been distributed, represents a small fraction of the overall "causal significance," *see Paroline*, 134 S. Ct. at 1728, of this particular victims losses. As such, it is suggested that an order of $1,000 restitution per victim is appropriate under the circumstances.

## CONCLUSION

Based on the foregoing, Mr. Letourneau respectfully requests this Honorable Court adopt the plea agreement and sentence her to a term of 192 months imprisonment on docket number 15-cr-10156, 12 months imprisonment on docket number 17-cr-10335 to run concurrently with the sentence imposed in docket number 15-cr-10156, five (5) years of supervised release, a $2,000 fine, and order $1,000 in restitution to the requesting victim. Mr. Letourneau also respectfully requests this Court make judicial recommendations that he be admitted to the Residential Drug Abuse Program and designated to either FCI Elkton, FCI Tuscon, or FMC Devens (in order of preference), and that the time he served while in pretrial detention prior to his release on conditions, and since his arrest in Colorado, be credited towards his overall sentence.

Date: February 20, 2018

Respectfully submitted,
SCOT B. LETOURNEAU
By and through his attorney,

/s/ *R. Bradford Bailey*
R. Bradford Bailey, BBO#549749
BRAD BAILEY LAW, P.C.
44 School St., Suite 1000
Boston, Massachusetts 02108
Tel.: (857) 991-1945
Fax: (857) 265-3184
brad@bradbaileylaw.com

Certificate of Service

      I, R. Bradford Bailey, hereby certify that on this, the 20th day of February, 2018, I caused a true copy of the foregoing *Defendant's Memorandum in Aid of Sentencing* to be served upon all necessary parties by virtue of electronically filing the same via the court's CM/ECF system.

                                        */s/ R. Bradford Bailey*
                                        R. Bradford Bailey